## ROBERT SCOTT *vs.* BOSTON & NEW ORLEANS STEAMSHIP COMPANY.

In assessing damages against a common carrier running a line of vessels between two ports, for his failure to transport and deliver seasonably at one port goods which he received at the other for transportation by a certain vessel without notice that the consignee had sold them to arrive by that vessel, and which he transported by a subsequent vessel, whereby the sale was defeated, the consignee contended that the measure of damages was the decline in the market value of the goods at the port of delivery between the time of his sale of them and the time when they were delivered to him, and the carrier contended

that it was the decline in their market value there between the time when they should have been delivered and the time when they were delivered. *Held,* that the latter measure was correct.

CONTRACT against common carriers for their failure to deliver seasonably at Boston cotton shipped thither by the plaintiff on their steamship at New Orleans. Trial in the superior court, before *Reed,* J., who reported the following case to this court:

"In August 1867 the defendants were common carriers and owned steamships carrying freight between the ports of New Orleans and Boston, and their steamship Kensington was lying in the port of New Orleans, advertised to take freight for Boston. The plaintiff's agents delivered into the custody of agents of the defendants, on the wharf, alongside the steamer, 469 bales of cotton, and received the defendants' bills of lading therefor, in the usual form. The Kensington sailed for Boston August 15. By an error of judgment, the captain signed bills of lading for more cotton than he could carry, and therefore left a portion on the wharf or in the sheds of the defendants, including 100 bales belonging to the plaintiff, which, in the language of the defendants' agents, were 'shut out' from this steamer. The plaintiff was at once notified that these 100 bales would be forwarded by the defendants' next steamer, the St. Louis, and he transferred his insurance to the cotton on that steamer. This notice came from the correspondent of the plaintiff, but the variety of marks was so great that it was impossible to tell which of the 469 were shut out, the marks of the 100 bales shut out not being given.

"The plaintiff had sold the 469 bales of cotton 'to arrive' in Boston, contracting to deliver them on the arrival of the Kensington. The sales 'to arrive' were made at different dates, from August 6 to August 21; and the defendants had no notice of any of these sales. Upon the arrival of the Kensington at Boston on August 26, the freight bills for the 469 bales were duly presented by the defendants' agents, and the freight paid by the plaintiff at the rate expressed in the bills of lading; and no other freight was ever paid on the 100 bales.

"The St. Louis sailed from New Orleans August 28, and arrived at Boston September 6, 1867, bringing the 100 bales shut

out from the Kensington. The market at Boston declined, in the interval between the dates of the sales ' to arrive' and the arrival of the St. Louis, and the plaintiff was unable to fulfil his contracts of sales ' to arrive' by the Kensington, and made sales at a lower price of a portion of the cotton.

"This action was brought to recover any damages or losses which the defendants, by reason of the failure to deliver at Boston said 100 bales by the Kensington, are liable in law to pay to the plaintiff. The defendants contended that upon the foregoing facts the measure of damages was the decline in market value, if any, of cotton in Boston, between the times of delivery from the Kensington and from the St. Louis. The plaintiff contended that the decline between the dates of sales ' to arrive,' and the date of delivery by the St. Louis, was the measure of damages. By agreement of the parties, the case was taken from the jury and reported, and is to be sent to an assessor to assess the damages according to such rule as the supreme judicial court shall determine."

*A. Russ,* for the plaintiff.

*G. O. Shattuck & W. A. Munroe,* for the defendants, were not called upon.

COLT, J. The ordinary measure of damages, in an action against a common carrier, for a failure to deliver in time goods intrusted to him for carriage, is the difference between the market value at the time when and place where they ought to have been delivered, and their market value at that place on the day when they were in fact delivered. The plaintiff contends that, as he had previously sold a part of the cotton in question "to arrive," the application of a different rule is here required, and that a new element, not considered in the cases which have been decided by this court, is introduced. *Cutting* v. *Grand Trunk Railway Co.* 13 Allen, 381.

The sales of this cotton "to arrive" were made some days before the delivery of it to the defendants for transportation, and at prices, we infer, which were above the market value on the day it should have arrived in Boston. The plaintiff insists that the decline in market value between the dates of these sales and the

actual arrival of the cotton is the measure of damages. But there is nothing in the facts relied on, to vary the rule above stated. The defendants, on receiving the property, had no notice of the contracts of sale relied on; and the profits which might, on a falling market, have resulted therefrom to the plaintiff, could not then have been contemplated by the parties. to the contract of transportation as an element of damage. They are not the direct and natural result of the defendants' default, but arise from the plaintiff's independent dealings, not known to the defendants, and as such are not entitled to consideration in the estimate of damages, in extension of the rule above given. *Hadley* v. *Baxendale*, 9 Exch. 341. *Williams* v. *Reynolds*, 6 Best & Smith, 495.

It would ordinarily be unjust to make loss of profits by the plaintiff, on a sale made in anticipation of a delivery to him contracted for with the defendant, a basis of damages; because the plaintiff, especially where the property sold has an established market value, can always protect himself from loss, by supplying the commodity from other sources at the market price. He cannot be permitted to recover of the defendant for losses which by reasonable effort he might have avoided.

*Case to be sent to an assessor.*